IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

─────────────

**PIMA COUNTY, ET AL.**
*Plaintiffs/Appellees,*

*v.*

**STATE OF ARIZONA, ET AL.**
*Defendants/Appellants.*

─────────────

No. CV-21-0213-PR
Filed July 22, 2024

─────────────

Appeal from the Arizona Tax Court
The Honorable Christopher T. Whitten, Judge
No. TX2018-000737
**REVERSED**

Opinion of the Court of Appeals, Division One
252 Ariz. 63 (App. 2021)
**AFFIRMED**

─────────────

COUNSEL:

Laura Conover, Pima County Attorney, Bobby H. Yu, Deputy County Attorney, Tucson, Attorneys for Pima County

P. Bruce Converse, Bennett Evan Cooper (argued), Dickinson Wright, PLLC, Phoenix, Attorneys for Tucson Unified School District No. 1

Kristin K. Mayes, Arizona Attorney General, Drew C. Ensign (argued), Civil Appeals Section Chief, Phoenix, Attorneys for State of Arizona

Kristin K. Mayes, Arizona Attorney General, Jerry A. Fries, Assistant Attorney General, Phoenix, Attorneys for Arizona Department of Revenue

Kristin K. Mayes, Arizona Attorney General, Kelly Soldati, Assistant Attorney General/Section Chief Counsel, Phoenix, Attorneys for Arizona State Board of Education and Arizona Superintendent of Public Instruction

─────────────

JUSTICE BRUTINEL authored the Opinion of the Court, in which CHIEF JUSTICE TIMMER, VICE CHIEF JUSTICE LOPEZ and JUSTICES BOLICK, BEENE, MONTGOMERY and KING joined.

_____

JUSTICE BRUTINEL, Opinion of the Court:

**¶1**      We are asked to determine whether, following the legislature's amendments to A.R.S. § 15-910, the State must reimburse Pima County for desegregation expenses that exceed the Arizona Constitution's 1% Limit on residential property taxes as "additional state aid for education."  More specifically, we consider whether taxes levied to pay for desegregation expenses—which are subject to the Arizona Constitution's 1% Limit on residential property taxes—continue to be "primary property taxes" as defined by A.R.S. § 15-101(20) following the 2018 amendment to § 15-910.

**¶2**      We hold that funding allocations for desegregation expenses authorized by § 15-910(G)–(L) are not "primary property taxes" as defined in § 15-101(20).  Accordingly, desegregation expenses are not included in the A.R.S. § 15-972(E) calculations, which only reimburse primary property taxes.  Thus, the State is not required to reimburse desegregation expenses that otherwise would exceed the 1% Limit as additional state aid for education.  Accordingly, we affirm the opinion of the court of appeals.

## BACKGROUND

**¶3**      In 1980, Arizona voters added article 9, section 18 to the Arizona Constitution.  Subsection (1) of section 18 (the "1% Limit") caps the amount of ad valorem taxes on residential property in any tax year at one percent of the property's full cash value.  Ariz. Const. art. 9, § 18(1).  That said, three types of ad valorem taxes are excluded from the cap:

> (a) Ad valorem taxes or special assessments levied to pay the principal of and interest and redemption charges on bonded indebtedness or other lawful long-term obligations issued or incurred for a specific purpose.

> (b) Ad valorem taxes or assessments levied by or for property improvement assessment districts, improvement districts and

other special purpose districts other than counties, cities, towns, school districts and community college districts.

(c) Ad valorem taxes levied pursuant to an election to exceed a budget, expenditure or tax limitation.

*Id.* art. 9, § 18(2). Additionally, § 18(8) directs the Arizona Legislature to "provide by law a system of property taxation consistent with the provisions of this section." *Id.* art. 9, § 18(8).

¶4 In 1981, the legislature complied with this requirement by creating a new education code: Title 15. *See* 1981 Ariz. Sess. Laws ch. 1, § 2 (1st Reg. Sess.). At the time of its enactment, Title 15 did three things relevant here.

¶5 First, Title 15 defined two tax classifications, "primary property taxes" and "secondary property taxes," for purposes of that code. *See id.* These statutory tax classifications remain unchanged today. *Compare id.*, *with* § 15-101(20), (25).

¶6 Primary property taxes are defined as "all ad valorem taxes except for secondary property taxes." § 15-101(20). Secondary property taxes are

ad valorem taxes used to pay the principal of and the interest and redemption charges on any bonded indebtedness or other lawful long-term obligation issued or incurred for a specific purpose by a school district or a community college district and amounts levied pursuant to an election to exceed a budget, expenditure or tax limitation.

§ 15-101(25). This definition of secondary property taxes tracks the constitutional exceptions to the 1% Limit. *Compare* § 15-101(25), *with* Ariz. Const. art. 9, § 18(2).

¶7 Although primary property taxes are only defined by reference to secondary taxes, they may be used for any school district expenditure the legislature statutorily authorizes; and such expenditures in total may exceed the amount of the 1% Limit. 1981 Ariz. Sess. Laws ch. 1, § 2 (1st Reg. Sess.). To comply with the 1% Limit, primary property tax expenditures authorized by the legislature in excess of the 1% Limit are

reimbursed by the State; they may not be levied against residential property owners. *See id.*; § 15-972(E). The reimbursement process is prescribed by § 15-972(E) and contains three steps: (1) the board of supervisors determines "whether the total primary property taxes to be levied for all taxing jurisdictions" exceeds the 1% Limit; (2) the board applies "a credit against the primary property taxes due" for each residential parcel taxed in excess thereof; and (3) the State pays "[s]uch excess amounts" as "additional state aid for education for the school district or districts in which the parcel of property is located." At the inception of the statute, by definition, only primary property taxes were subject to the 1% Limit and subsequently reimbursed. 1981 Ariz. Sess. Laws ch. 1, § 2 (1st Reg. Sess.); *see* § 15-972(E).

¶8 Second, to limit the amount of school district spending, Title 15 created the Revenue Control Limit, a statutory spending limit on school districts. 1981 Ariz. Sess. Laws ch. 1, § 2 (1st Reg. Sess.); *Cave Creek Unified Sch. Dist. v. Ducey*, 233 Ariz. 1, 3 ¶ 2 (2013) (noting that the Revenue Control Limit is "a budget expenditure limit used to calculate the amount of certain state funds provided to school districts"); *see* A.R.S. § 15-971(A)–(C) (providing that certain state funding is determined, in part, by the school district's Revenue Control Limit).

¶9 Third, Title 15 set strict budgetary mandates: "[n]o expenditure shall be made by any school district for a purpose not particularly itemized and included in the budget." 1981 Ariz. Sess. Laws ch. 1, § 2 (1st Reg. Sess.); *see* A.R.S. § 15-905(N) ("Except as provided in § 15-916, no expenditure shall be made by any school district for a purpose not included in the budget . . . .").

¶10 In 1978, two years before the voters constitutionalized the 1% Limit, the Tucson Unified School District ("TUSD") became subject to a federal desegregation order, which did not end until 2022. *See Fisher v. Tucson Unified Sch. Dist.*, 329 F. Supp. 3d 883, 887 (D. Ariz. 2018); *Fisher v. Tucson Unified Sch. Dist.*, No. 74-cv-00090-TUC-DCB, Order at 2:17–18, 18:3–4 (D. Ariz. July 20, 2022). Starting in 1985, the legislature began assisting districts' compliance with such desegregation orders by adding A.R.S. § 15-910(F)–(H) (1985), authorizing districts that year and thereafter

to use primary property taxes to pay desegregation compliance expenses.[1]
1985 Ariz. Sess. Laws ch. 166, § 15 (1st Reg. Sess.).

**¶11**     This statute permitted school districts to: (1) budget for desegregation expenses outside of the Revenue Control Limit, and (2) pay for desegregation expenses budgeted outside the Revenue Control Limit with primary property taxes. *Id.* Subsections (F)–(H) of § 15-910, which have since been renumbered as subsections (G)–(H), also allowed school districts to be reimbursed for desegregation expenses by the State in excess of the 1% Limit by allowing them to include desegregation expenses in their budget to be incorporated into the county's primary property tax levies. *Id.*; § 15-910(G)–(H) (reflecting the 1985 subsections (F)–(H) as subsections (G)–(H)).

**¶12**     The controversy here arises because, thirty-three years later, in 2018, the legislature modified § 15-910 to limit the authority to budget for desegregation order expenses in § 15-910(G), i.e., budget for expenses outside the Revenue Control Limit, only if the district uses revenues from secondary property taxes rather than primary property taxes to fund such expenses. 2018 Ariz. Sess. Laws ch. 283, § 2 (2d Reg. Sess.). That legislation added, among other things, subsection (L) to § 15-910, which stated:

> Beginning in fiscal year 2018–2019, subsections G through K of this section apply only if the governing board uses revenues from secondary property taxes rather than primary property taxes to fund expenses of complying with . . . a court order of desegregation . . . directed toward remediating alleged or proven racial discrimination that are specifically exempt in whole or in part from the revenue control limit and district additional assistance. Secondary property taxes levied pursuant to this subsection do not require voter approval, but shall be separately delineated on a property owner's property tax statement.

---

[1] This was not the first time the legislature attempted to help school districts comply with such orders. In 1983, the legislature enacted the first statute aimed at helping school districts comply with such orders without violating the statutory Revenue Control Limit. 1983 Ariz. Sess. Laws ch. 62, § 1 (1st Reg. Sess.).

*Id.* The legislature also replaced the term "primary property taxes" with "secondary property taxes" in various subsections pertaining to desegregation expenses budgeted outside the Revenue Control Limit. *See id.*

¶13 The 2018 amendment did not, however, change the definition of primary or secondary property taxes in Title 15's definition section. *See id.*; *see also* § 15-101 (providing definitions in Title 15 "unless the context otherwise requires" and defining primary and secondary taxes).

¶14 Importantly, the two independent revenue ceilings—the 1% Limit and the Revenue Control Limit—remain binding on school districts and on counties. *See, e.g.*, A.R.S. §§ 15-947, -905. And school districts must still comply with strict budgetary mandates. *See, e.g.*, § 15-905 (providing for annual budgets); *see also* A.R.S. § 42-17106(A)(1) ("[A] county, city or town shall not . . . [s]pend money for a purpose that is not included in its budget.").

¶15 For the 2018–2019 fiscal year, under the new statutory scheme, TUSD adopted a budget that continued to include desegregation expenses under § 15-910; and in compliance with the new law, budgeted for such expenses with secondary taxes. The budget, including the required estimates for the primary and secondary property tax levies necessary to fund that budget, was submitted to Pima County.

¶16 Adopting TUSD's budget, Pima County sent property tax statements to homeowners within the district, which separately delineated property taxes levied to fund school desegregation expenses, in accordance with § 15-910(L). Likewise, Pima County listed these taxes as secondary in its resolution adopting the tax levy. Notably, those taxes were neither authorized by an election under § 15-910(L) nor were they otherwise exempt from the 1% Limit. *See* Ariz. Const. art. 9, § 18(2)(c).

¶17 In compliance with § 15-972(E), Pima County totaled all 2018–2019 ad valorem taxes levied within TUSD's boundaries and determined the taxes, both primary and the secondary taxes budgeted for desegregation expenses, exceeded the 1% Limit on residential property taxes by $8,113,188.62. Pima County then reduced its levy on residential property owners by that amount, as required under § 15-972(E), and added

it to the county's calculation of expected additional state aid for education for TUSD.

**¶18**  The Arizona Department of Revenue determined that the desegregation expenses—which TUSD budgeted to pay for with *secondary* property taxes pursuant to § 15-910(L)—did not qualify as "additional state aid for education" under § 15-972(E) because credit under § 15-972(E) may be applied only "against the *primary* property taxes due."  (Emphasis added.)  Therefore, the state aid calculations, which the Department of Revenue provided to the State Board of Education, did not include the desegregation expenses that exceeded the 1% Limit, and the State declined to reimburse the $8,113,188.62 that Pima County sought in additional state aid for education.

**¶19**  Pima County and TUSD (collectively, the "County") sued to force the State to pay.  Both parties moved for summary judgment.

**¶20**  The tax court granted the County's motion and denied the State's.  The court reasoned that § 15-910(L) "cannot trump the constitutional limitation on ad valorem taxes found in Ariz. Const. art. 9, § 18."  The court found the State's proffered interpretation of § 15-910(L) to be "unworkable" and stated that it must be construed in accordance with Arizona's constitutional mandate.  The State appealed.

**¶21**  The court of appeals reversed, concluding that § 15-910(L) did not implicate constitutional concerns because the legislature was within its authority to amend the statutory scheme it had created.  *Pima County v. State*, 252 Ariz. 63, 67–68 ¶ 14 (App. 2021).  The court reasoned that, although the meaning of § 15-910(L) would have been clearer had the legislature also amended the statutory definition of secondary property tax in the code's definition section, the State still prevails because any conflict between the general definition in the definition section and the new secondary property tax label in § 15-910(L) should be resolved in favor of the newer, more specific statute—i.e., § 15-910(L).  *Id.* at ¶¶ 14–15 ("[T]he legislature is free to alter the [purely statutory] characterization of taxes assessed for one purpose or another as 'primary' or 'secondary' without running afoul of the one percent constitutional mandate.").  This petition followed.

**¶22**     We granted review to consider whether the 2018 amendments eliminated the State's obligation to reimburse the County for desegregation expenses under § 15-972(E) and if so, whether those amendments violate article 9, section 18 of the Arizona Constitution. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution.

**DISCUSSION**

**¶23**     We review the grant of summary judgment de novo. *Rogers v. Mroz*, 252 Ariz. 335, 339 ¶ 11 (2022). Issues of statutory interpretation are issues of law, which this Court also reviews de novo. *Brenda D. v. Dep't of Child Safety*, 243 Ariz. 437, 442 ¶ 15 (2018). This Court's goal in statutory interpretation is "to effectuate the legislature's intent as expressed in the statute's text." *Silver v. Pueblo Del Sol Water Co.*, 244 Ariz. 553, 559 ¶ 22 (2018) (internal quotation marks omitted) (quoting *Rasor v. Nw. Hosp., LLC*, 243 Ariz. 160, 164 ¶ 20 (2017)). Unless there is ambiguity in a provision's meaning, or a provision's plain meaning would produce absurd results, this Court's inquiry "begins and ends with the plain meaning of the legislature's chosen words, read within the 'overall statutory context.'" *Welch v. Cochise Cnty. Bd. of Supervisors*, 251 Ariz. 519, 523 ¶ 11 (2021) (quoting *Rosas v. Ariz. Dep't of Econ. Sec.*, 249 Ariz. 26, 28 ¶ 13 (2020)).

**¶24**     At issue here is whether, under § 15-972, the State must reimburse TUSD's desegregation expenses "as additional state aid for education." We conclude that the State need not pay TUSD's desegregation expenses because the legislature's 2018 amendments to § 15-910 removed TUSD and Pima County's authority to budget desegregation expenses using primary property taxes, instead creating a new classification of secondary property tax for budgetary purposes. This new classification is not part of the § 15-972 calculations because, by its terms, § 15-972 applies only to primary property taxes. § 15-972(E) (specifying that if the "total *primary* property taxes to be levied . . . violate [the 1% Limit]" the State must "apply a credit against the *primary* property taxes due" and pay that amount as "additional state aid for education" (emphasis added)).

**¶25**     When it passed Title 15, the legislature created the primary and secondary property tax classifications pursuant to the constitutional command to create "a system of property taxation consistent" with article 9, section 18. *See* Ariz. Const. art. 9, § 18(8). The definitions in § 15-101(20) and (25) distinguish between constitutionally capped primary taxes and

secondary taxes which are constitutionally permitted to exceed the 1% Limit (because they track the 1% Limit's exemptions). *See* § 15-972(E); *see also* A.R.S. § 42-17152(A) (prohibiting county boards of supervisors from assessing "primary property taxes . . . in any tax year against real property . . . in excess of one per cent of the property's limited property value").

¶26 But article 9, section 18 of the Arizona Constitution makes no mention of primary or secondary property taxes. Rather, the classifications are purely statutory and, as such may be amended or superseded at the discretion of the legislature, so long as the amendments do not violate the constitution by causing taxpayers to pay more than 1% of their limited property value. We agree with the court of appeals that here they do not.

¶27 When the legislature added § 15-910(L), it created a new kind of tax classification, which it chose to label as a "[s]econdary property tax." 2018 Ariz. Sess. Laws ch. 283, § 2 (2d Reg. Sess.). Section 15-910(L) states secondary property taxes "do not require voter approval" and "shall be separately delineated on a property owner's property tax statement." § 15-910(L). The secondary property tax created by § 15-910(L) is not the same type of secondary tax found in the definitions of secondary property taxes in § 15-101, nor those in Title 42 (concerning taxation), nor does it fall within any of the three exceptions in article 9, section 18. *Compare* § 15-910(L), *with* § 15-101(25), *and* A.R.S. § 42-11001(16), *and* Ariz. Const. art. 9, § 18(2). Like primary taxes, § 15-910(L) secondary taxes may not exceed the 1% Limit nor be charged to property owners to the extent they exceed the 1% Limit. Although the legislature's choice of name may be confusing, this difference between § 15-910(L) secondary property taxes and § 15-101(25) secondary property taxes is not impermissible.

¶28 Similarly, the statutory context requires us to read § 15-910(L) to conclude that the legislature created a new classification of secondary property tax because doing so gives meaning to the legislature's language and harmonizes statutes rather than creating statutory conflicts. *See* § 15-101 (qualifying its definitions by stating they control "unless the context otherwise requires"). "[W]e seek to harmonize statutory provisions and avoid interpretations that result in contradictory provisions." *Lagerman v. Ariz. State Ret. Sys.*, 248 Ariz. 504, 511 ¶ 35 (2020) (internal quotation marks omitted) (quoting *Premier Physicians Grp., PLLC v. Navarro*, 240 Ariz. 193, 195 ¶ 9 (2016)). Thus, we interpret statutes "as a whole, and give

meaningful operation to all of [their] provisions." *Wyatt v. Wehmueller*, 167 Ariz. 281, 284 (1991). Besides labeling § 15-910(L) taxes as secondary, the legislature also deleted references to primary property taxes in § 15-910(G), which authorizes school districts to budget for desegregation expenses outside the Revenue Control Limit. 2018 Ariz. Sess. Laws ch. 283, § 2 (2d Reg. Sess.). And the legislature replaced the word "primary" with "secondary" in § 15-910(H). *Id.* That subsection mandates school districts to "[n]otify the county school superintendent" of the amount of desegregation expenses budgeted outside the Revenue Control Limit—pursuant to subsection (G)—needed from (now) secondary property taxes. *Id.*; *see also id.* (replacing the word "primary" with "secondary" in § 15-910(I) so that school boards can advise the county school superintendent of "additional amount[s] needed" from "secondary property tax[es]" to cover desegregation expenses budgeted-for outside of district additional assistance, under subsection (G)).

¶29 Thus, the legislature's 2018 amendments to § 15-910(G)–(K) and its addition of § 15-910(L) reflected its intent to end state funding of desegregation expenses with primary taxes. *See* Ariz. H.R. B. Summary, S.B. 1529, 2d Reg. Sess. (2018), https://www.azleg.gov/legtext/53leg/2R/summary/H.SB1529_05-07-18_CHAPTERED.pdf (explaining that the 2018 amendment would "[r]equire[] . . . all tax levies for desegregation to be in the form of a secondary property tax, rather than a primary property tax"); 2018 Ariz. Sess. Laws ch. 283, § 2 (2d Reg. Sess.); *Sell v. Gama*, 231 Ariz. 323, 327 ¶ 16 (2013) ("Our goal in interpreting statutes is to give effect to the intent of the legislature." (quoting *Est. of Braden ex rel. Gabaldon v. State*, 228 Ariz. 323, 325 ¶ 8 (2011))); *see also State v. Mixton*, 250 Ariz. 282, 302 ¶ 90 (2021) (Bolick, J., dissenting) ("[W]hen a legislature amends a provision by making a significant change in language, we presume it intended a different meaning.").

¶30 Petitioners correctly argue that the 2018 amendments to § 15-910 did not change the requirement in § 15-972(E) to reimburse them for primary property taxes levied in excess of the 1% Limit. However, this does not mean that desegregation expenses budgeted under § 15-910 are primary taxes. There is no constitutional or statutory requirement that taxes exceeding the 1% Limit must be primary. When the legislature created a new kind of secondary tax in § 15-910(L), it also explicitly removed TUSD's statutory authority to budget for desegregation expenses

out of its primary tax levy. *See* § 15-905(N). Even if we were to read the tax created by § 15-910 as being "primary" under the § 15-101(20) definition, TUSD no longer has the legal authority to budget for or spend those taxes. Such a reading would render § 15-910(G)–(L) meaningless.

**¶31** Moreover, the new category of secondary property taxes established in § 15-910(L) does not violate the Arizona Constitution. The 1% Limit remains intact; all ad valorem property taxes outside of the exceptions in article 9, section 18 of the Arizona Constitution must still comply with the 1% Limit.

**¶32** The tax court found and Petitioners argue that the legislature's amendments are "unworkable." But, after the 2018 amendments, § 15-910(L) instructs that if a district wants to use § 15-910(G) and (H) to budget for certain court-ordered desegregation expenses in excess of the Revenue Control Limit, it must do so with the new type of *secondary* property taxes—as TUSD did. *See* § 15-910(L) ("Subsections G through K of this section apply only if the governing board uses revenues from secondary property taxes rather than primary property taxes . . . .").

**¶33** In compliance with the new statute, TUSD was able to budget for court-ordered desegregation expenses in excess of the Revenue Control Limit under § 15-910(G) with the new secondary property taxes. But because those taxes were not constitutionally exempt, they could only be paid with tax revenue that did not exceed or is not subject to the 1% Limit.[2]

**¶34** Contrary to the tax court ruling, excluding taxes used to fund desegregation expenses budgeted in excess of the Revenue Control Limit from § 15-972 calculations is not unworkable. Rather, it just means school districts and counties must do what they did before the legislature started reimbursing them for desegregation expenses in 1985: reduce their overall expenditures either for desegregation or in other areas so that their tax levy complies with the 1% Limit or pay such expenses with revenue not subject thereto. The legislature had the authority to take back what it had given, so long as it did not violate the constitution; and here, the legislature did

---

[2] We note that since 2022, the County is no longer subject to the desegregation order. *Fisher*, No. 74-cv-00090-TUC-DCB, Order at 2:17–18, 18:3–4.

not.  Thus, the constitutional mandate that "[t]he legislature . . . provide by law a system of property taxation consistent with the provisions of" article 9, section 18 is not violated.  *See* Ariz. Const. art. 9, § 18(8).

## CONCLUSION

¶35        The State is not obligated to reimburse the desegregation expenses paid by Pima County.  We affirm the court of appeals' opinion and remand this case to the tax court for the entry of judgment for the State. In our discretion, we decline to award attorney fees to either party.